Good morning. Welcome to the Ninth Circuit. You may be seated. Judge Gould and I are happy to welcome our colleague, Judge Lasnik, sitting by designation from the Western District of Washington. Thank you very much. Judge Gould, can you hear us? Yes, I can hear you. Good morning. Good morning. We have a number of cases that are submitted on the brief, so I won't read through those. The first case for argument is Hogue v. Silver State Schools Credit Union. You may proceed. Good morning, Your Honors, and may it please the Court. Miles Clark for Plaintiff Appellant Richard Hogue. I'd like to reserve two minutes of my time for rebuttal, if that's all right. All right. Try to watch the clock. I'll try to help you as well. Thank you, Your Honor. Your Honors, Section 1681S2B of the Fair Credit Reporting Act required Silver State to conduct a reasonable investigation of consumer disputes received from a consumer reporting agency. Silver State's investigation of Hogue's consumer dispute reported inaccuracies which divested Hogue of the benefit of his court-ordered contract and the fresh start he earned in his Chapter 13 bankruptcy discharge. These inaccuracies, post-petition and post-confirmation late payments, and post-discharge account balances were errors Silver State knew about and were within the scope of Hogue's dispute, which requested removal of all derogatory information after his bankruptcy filing date. Silver State had the means to correct these inaccuracies, but failed to do so. Thus, Silver State failed to conduct a reasonable investigation. These inaccuracies were patently incorrect because they deviated or they failed to reflect the realities of his bankruptcy, and materially misleading because they violated the guidelines Silver State claimed to follow. Hogue testified that he did not apply for credit based on Silver State's misreporting, that the reporting caused him to have arguments with his wife, that it exacerbated his medical conditions, that the reporting stressed him, that he suffered out-of-pocket expenses, and that he feared for his job due to an upcoming security background check. You're probably aware we've had a number of similar cases argued, and also we're operating under the Supreme Court's directive about the concrete particularized harm. With respect to the DirecTV situation, wasn't his application approved? Yes, it was, Your Honor. So as I take your argument, and we don't — it was not disseminated to any third party otherwise, as far as we know? Is that right? As far as the Experian reporting, we do know that. Okay. However, Mr. Hogue's inaccurate reporting would have gone to the other consumer reporting agencies, TransUnion and Equifax. Right. But so your claim is that the mere presence of the inaccurate data in his report is sufficient concrete harm to give him standing? That is correct, Your Honor. And that concrete harm is essentially anguish? It is anguish among other factors. The — Mr. Hogue took actions that he would not have otherwise taken. He testified that he did not apply for credit for fear that this information would appear. He also testified that he was concerned about his security background check, because at his 2012 background check, the Federal agents who evaluated him brought up Silver State's reporting. His concern with the reporting on reinvestigation was that, based on the reinvestigation, it was not clear when that account would actually age off. And if you compare the trade lines both before and after the reinvestigation, you'll find that that's true. I pasted the dispute on page 10, and you can find the reinvestigation on page 14. The original credit report did contain inaccuracies, the wrong bankruptcy chapter, interim bankruptcy reporting. But it also said that this account is scheduled to continue on record until 2016. On the reinvestigation, that information is absent. It is not clear when, if ever, the information would actually age off. And that matters for Mr. Hoek, because he knew that the background check was a periodic problem, and it was he thought it would take place in 2017. And so if his trade line ages off, as he was told in his original credit report of January 2016, he doesn't have that problem, because the bankruptcy would have been gone by the time that the Federal agents reviewed his credit report, if they chose to do so. However, on reinvestigation, because the account did not indicate when it would age off, and because the derogatory entries on the account postdated the filing date, then if you run the reporting from seven years from that information, the account could have continued to report until 2021, if you take the bankruptcy inclusion date, or 2017, if you take the voluntary surrender or the post-confirmation payment date. And that means that it might be on his credit report when the Federal agents did his background check. And at that point, Your Honor, everything else on the bankruptcy would have come off. But the one thing that would have remained would have been this one debt. And I'm sure the question that would have been asked would have been, well, did you actually comply with your obligations in the bankruptcy, and why would this debt still be reporting if everything else has gone off? And the answer to that is, of course I did, and that's why the reporting is wrong. So to Your Honor's question about the other cases, and I believe the Court requested briefing on Dutta, Daniel, Bassett, and Robbins, and I appreciate Your Honor is the author of the Bassett and the Daniel cases. I believe this case is most closely analogous to the Robbins fact pattern, because in that case there was publication of a consumer report, no indication about what that consumer report really, and no indication that any potential employer had reviewed that report or that Mr. Robbins had actually applied for a job. The concrete harm in that case that the Court found was that Mr. Robbins was concerned that information on that report might impact a future employer. And so in this case, the facts are squarely in line with that conclusion. The Mr. Ho was concerned about the information on the back on the that would appear on the future employment for his future employment. In addition, Mr. Robbins took actions he wouldn't have otherwise taken. He would have applied for credit. He didn't apply because he was afraid of being denied. And the and so essentially Robbins is also dealing with the same type of statute. Now, EB is distinct in that there is the phrase consumer reports appears in that statutory subsection. That phrase is nowhere to be found in S2B. Incidentally, it is found in 1681IA6B Romanet 2, which indicates that a consumer must receive a consumer report on reinvestigation based on the consumer's file. But the so there's no this case is distinguishable from Robbins in that there is no presumption of a consumer report based on that statute. But in both Robbins and this case, the ubiquity of credit reporting and its impact in modern life is is equally omnipresent. And and so that I believe that case is the most analogous. As it relates to to Bassett and Daniel, the I believe that those cases are obviously the there the the Court was talking about the unique circumstance that had led Congress to enact a very limited restriction on the ability to bring a willfulness lawsuit. And Congress, you know, using its congressionally authorized fact-finding powers, had marshaled expert testimony saying that that account credit card expiration dates when added to account balance information was was not did not create any additional actual damage. And so for that reason, and based on the fact that there were a number of these lawsuits that were filed, the Congress decided that they would give a temporary reprieve to the to defendants who had had those lawsuits. And so, I mean, there you have congressional intent to to restrict one class of disputes under Section 1681C, subsection G, and restrict them only for willfulness issues. And so I think that, and so I think the Court reached the appropriate result there in in connection with that particular claim. I haven't seen anything in the legislative history that would similarly restrict the ability of a consumer to bring a suit under Section 1681S2B. And in addition, Mr. Hoogs proves the thing that Bassett and Daniel both did not have. He's he's proven he's he's proven actual damages. This isn't just a no-damages case. He's taken actions based on the reinvestigation. So I think that I I think that Bassett is is appropriate for that particular context. Also, Bassett deals with the really fundamentally the privacy aspects of the FCRA and not the accuracy aspects of the FCRA. So the fundamental distinction between what you can do with your information and what you can prevent others from doing, I think, is is is also in play here. The Daniel case, though, suggests that in connection with an Article III analysis, that that a plaintiff who can prove that there was actual fraud should be granted leave to amend. So, you know, even in the context of a case where we have this limited statutory restriction, if there is evidence of actual fraud, then if there is evidence of actual fraud, then then perhaps the consumer can prove a concrete harm. But I think that, you know, again, the the very, very narrow scope of the congressional restriction on that subsection should should not should not disturb other subsections of the FCRA, especially given the Ninth Circuit's liberal interpretation of the FCRA in in in favor of consumers. The and in the last case, Dutta is both is both it's both distinguishable based on the law and based on the facts. This is obviously set out in our supplemental brief. But to reiterate briefly, the the Dutta case is dealing with Section 1681BB3A. And there the only person who can see a consumer report is the employer. That's the whole basis for the harm, that you don't that there are certain procedures that that are followed when an employer makes a credit decision or an employment decision based on a consumer report. And in the Dutta case, the there's only one person who can see it. In in 1681S2B, it presupposes a broader reach, the kind of broad reach of of dissemination of private credit information that that was also contemplated that was contemplated in Robbins. Because in Section 1681S2B, you have to send the results of the of your investigation to other consumer reporting agencies. Anyone who has a permissible purpose to obtain that information can do so. So so unlike the Dutta case, which only dealt with a single entity, this case, in this case, Mr. Hogue's fear of credit denials is broad-reaching, and the Court should similarly find that that Article III standing reaches the concrete harms that he alleges, especially given that we have evidence of a consumer report that was issued during the time that this reporting had occurred, which is in line with Robbins. So the other reason that Dutta is distinguishable is based on the is based on the procedural history in that case. Dutta did not object to the evidence, which, of course, was a declaration from State Farm, the entity who was sued, who would have made the decision. What the Court had was a declaration from an Experian witness who was not disclosed, and although Experian's 30b-6 was. And they had and we actually did challenge that declaration in the Court below. It did that in two ways. First of all, we offered a declaration that Silver State had already seen in a case in another case in which another Experian witness said that this account balance information would in fact disappear on a consumer report. It was a different name than the credit profile report that Ms. Hoover declared, but it would clearly exist. Then, after I took Ms. Hoover's deposition in another case, and she said that I don't know what's on a consumer report sent to third parties or what it would even look like, well, then I thought to myself, well, it looks like Ms. Hoover doesn't have any personal knowledge. So I went to the Court and asked them for supplemental evidence in to use that declaration or that deposition testimony to supplement the record in Hoag, and the Court did not reach that issue. So, again, the issue that the Dutta Court found conclusive, that plaintiff did not dispute the information or object to the deposition or the declaration, is entirely absent from the record in this case. So I think that, in summary, the four cases that Your Honor has asked us to look at, the Robbins case is clearly the most on point. And Dutta, Daniel, and Bassett are all distinguishable on both their facts, and for Dutta, also the procedural posture. Thank you. Do you want to save the remaining time? I do. Thank you, Your Honor. Good morning, Your Honors. Michael Brooks, appearing on behalf of the Respondent Silver State Schools Credit Union. I am going to launch straight into my discussion regarding the standing first. I think while counsel, if you'll excuse me just a moment while I load my notes, a couple of things. First of all, counsel talks a lot about what would have happened had this information been seen, what fears might have occurred, what things could have happened. And the FCRA is not concerned, does not have a provision that addresses what would or might happen. It addresses what does happen. And my argument will be focused specifically on that. The other thing, I do, I want to just preface my comments by pointing out that what Spokio told us is that the constitutional standing requirement still applies, even in the context of a consumer protection statute. And we, since the Spokio decision has come down, we've gotten a number of rulings from this circuit panel or, excuse me, from the circuit explaining its understanding of the Supreme Court's decision in the Spokio matter. And the decisions that we've addressed in the supplemental brief address three essential issues. One is going to be whether it was published or disseminated, which is an issue frequently. Secondly is the materiality. And third is the traceability. And if I could address Judge McKeon's question regarding the viewing of the DISH network credit poll, first of all, we don't concede that they saw any of the negative information that's alleged. But moreover, the argument is, even if they had seen it, the fact that they were granted credit would have alleviated any fears that that misinformation could have caused some harm or damage. There was no harm or damage that resulted. So the traceability is wiped out, and so under the Dutta decision, you don't have a traceable injury as a result of that. That's all I'm going to say on the traceability argument. I will address the briefing on that to speak for itself. The other issue with regard to standing is the district court actually made a very important finding in its order. Page 9 of the order specifically says that the negative information at issue here was not published in a consumer report viewable by a third party. I'm changing one of the words. But to clarify, there are three important aspects in that. First of all, the negative information at issue. The negative information at issue is routinely cited as the graphical information that's contained at the bottom of that 14 of Appellant's brief. There are those graphical items. Those items have to be published and seen in a consumer report before they can be causing any injury. The second thing in the Court's order, it states, published in a consumer report. And as I'll point out, we provided evidence that those items are not published in a consumer report for different reasons. And then third, viewable by third parties. And it's important here to recognize, and I don't think it was clearly stated on the record, but the dispute response from Silver State Schools Credit Union occurred in early August of 2015, and this account fell off of Mr. Hogue's credit report in January of 2016. So within that six months, we know that there was one soft pull of credit network. So the question before the Court is, is there a tribal issue of fact that a third party saw either the payment history or the account history between July 2015 and August 2016? I'm much better with details and facts than I am with abstractions of law, Your Honor. We know from the record the plaintiff has offered no testimony, no evidence, no exhibits, nothing that would indicate that Dish Network actually saw either the payment history items or the account history items, those graphs at the bottom. Conversely, we presented the district court first with the declaration of Amanda Hoover. And the declaration of Amanda Hoover, whatever procedural issues you might have with it, the substance of it was not materially addressed or not disputed. In particular, yes. I do have some questions about Amanda Hoover's prior testimony. It seemed — it's unclear to me that the district court did anything with it. There were objections. There were putting it in. But I don't actually see a ruling. Can you let me know if there's a ruling one way or the other? There was no — first of all, Your Honor, I'm not aware of a specific objection to the evidence. I know that there was some challenges to the credibility and some other issues, but there was no objection to the evidence, to the admission of the declaration. Rather, what there was, was, look, her testimony, it goes to — went to the weight of the evidence. It went to whether or not she could be believed when she was saying these things. And obviously — Is that a summary judgment-appropriate piece of evidence? Your Honor, the court treated it as admissible evidence. And I will point out that the — Well, but, you know, I guess the problem I'm having is that summary judgment, if there's a dispute about whether she's believable or whether those procedures were the same as followed generally, then it seems to me, if it's material — I'm not saying one way or the other — if it's material, then you can't have a summary judgment. Your Honor, the only thing I would say is there was no evidence to contradict the foundational factual assertion that this information didn't appear. He challenged her general ability to testify to these matters, but he didn't challenge the specific factual assertion. The district court looked at that and was satisfied that her factual assertion was accurate. It was corroborated by an exhibit, which was part of the user guide. We've included that in our supplemental — our supplemental record. And the court was satisfied. And as a result of that, the court made its finding that, in fact, this — as I said, this finding, no third party viewed this information. And I think it's important, if I can run through the — this item really quickly. Ms. Hoover, first of all, the two items, let's take them in particular. The payment history, paragraph 32 and 33 of Amanda Hoover's declaration, which is in your excerpts of records at page 46, specifically says that only the 25 months prior to the balance report date, balance report date being May 2014, is when the only information after April of 2012 would appear on the credit report pulled by a third party. The last report by my client, Silver State Schools, was in March of 2010. It would not, by definition, come up as — populate as part of the credit report. That's with regard to the payment history graph. Then with regard to the account history graph, she gave similar testimony that that And — and I would point out, it's also the user guide indicates information that goes into a consumer report, and that account history section does not — is not included in that. The declaration, probably the most lethal argument or piece of evidence to Mr. Hogue's argument, was the declaration that he presented. The declaration of Ms. Mary Methvin, excerpts of record 34 through 40, says one key difference is that Experian does not include any of the account history information when a creditor makes an inquiry associated with an application for new credit. So the very declaration that they cite in support of their position states that that information is not in a credit report. So at the end of the day, factually, there's nothing for him to go on that he suffered an injury because nobody saw what he believed was the materially misleading information. The second aspect, and I'm going to move on to the materiality, and — and this goes to everything included in those items, even if it was disclosed, on the materiality. Spokio gave us this pretty difficult test when it set forth the example of the incorrect zip code for materiality. There — there's a little — very little that is that insignificant in a credit report. But I will submit to you that in the context of reporting on a credit report, accurate reporting of information on an account, both with regard to the account payments and balances and accurate reporting of a bankruptcy discharge and a zero-balance owed, is sufficient. And — and it would make reporting of one of them — the — just because you report a delinquent payment after a bankruptcy discharge does not make it material to his financial health. The — the two — there's two essential views. The one view is FCRA requires accuracy. If that means you include delinquent payments or — or late payments and the discharge of the bankruptcy, that's accurate information, and that's fine. But Mr. Hogue relies on the Allback decision, and the Allback decision has this phrase — uses this phrase, the nature of the debt has changed as a result of the bankruptcy. You have to report it differently. First of all, FCRA, the Fair Credit Reporting Act, doesn't require that. But I — I call this sort of the sacrament of bankruptcy argument because, in a sense, it — it takes on this — this aspect that a bankruptcy discharge order changes its nature, which a creditor is then required to go and to divine what the nature of that debt is at that point and to report it accurately in its credit reports. There's nothing in the law where the nature of a debt can necessarily change, even as a result of a bankruptcy discharge. The majority of the courts agree with the district court below that it doesn't rewrite history, and we urge the court to adopt the — err in — in favor of just simple accuracy on the credit reporting. The damage alleged here includes fear, which is a distinct damage that may or may not be concrete enough, but he also said that there are some economic damages here in terms of out-of-pocket expenses. Are those sufficient as a concrete injury? Not if — not if nobody ever saw the — the report. Not if — nobody ever saw the report. Not if it's not material. I mean, I — people can suffer damages for all kinds of reasons, but there has to be an injury that caused the damage in order for there to be standing. So you — I mean, we have to first establish that there was an injury here before we can talk about what kind of damages there were. So and then — and then lastly, and I — I'm sorry, if there — were there other questions or did I answer your question? Okay. I have one, counsel. Oh, yes. I have one question for me. Where does the anxiety that Hogue asserts he suffered fit into your standing analysis? Is that kind of mental distress or anguish sufficient under Spokane? Well, again, I think my answer is the same. Whether it's economic damages or emotional distress or anxiety, there has to be an injury that precipitates the — the damage that was incurred. And in this case, because it wasn't seen by anybody, because the record — the evidentiary record shows nobody saw it, and because the — there's no evidence that Dish Network ever saw — by the way, if there was any anxiety over Dish Network, the fact that he was able to get credit from the Dish Network, I haven't seen that in the record. That would be the only party to which there would have been any type of causal connection between the injury and the harm. The — so I think that answers your question as well, Your Honor, but I'm glad to answer anything further. No, that's fine. I guess your position is that the mere fact of the credit report sitting in a file is not sufficient. Yeah. And I would point out, this information is being warehoused by our friends at Experian, but they're not disseminating those aspects of this information on a credit report. That's the important thing. They've got all kinds of information. And there's something strange. My client never reported an $11,000 balance. That was — there's all these allegations. My client reported a zero balance. That was what — the reasonableness of my client's response, zero balance, discharge in bankruptcy, hey, Experian, you guys go report this information. This is what — how we view the account. It was all accurate. It was all reasonable and fair under the circumstances. The — what Experian ultimately did with that and the information they provided to debtor may have caused some confusion, but that wasn't on my client. But the information is there. It's stored in a warehouse. Not all of it is disseminated every time somebody asks, and in this case, we know the two items that allegedly caused the harm were not disseminated. The — with regard to — I'm going to — I'm not going to launch into anything at this point. I've got not enough time. Okay. All right. Appreciate that. Any other questions? No, I think there are.  Thank you. Thank you, Your Honors. Just a very brief follow-up. I'm briefly addressing counsel's point about the Merrimethvin declaration. In fact, if you look at Excerpts of Record pages 30 to 40, we did object to that. We produced Merrimethvin's declaration from that other case. And Merrimethvin actually distinguishes between a soft inquiry and a hard inquiry. What — and if you look at the plain language of how Experian explains these polls to a consumer, hard inquiries are applications for new credit, and that's what Ms. Hoover is talking about in the Credit Profile Report. Merrimethvin actually distinguishes between a soft inquiry and a hard inquiry in her own declaration. And in this case, DirecTV procured a soft inquiry. So, again, there is absolutely a disputed issue of material fact as to what information was published, even if the Court decides to hold that standard. Briefly, as well, the — getting back to the Article III standing issue for a second, if the Court was inclined to hold that there is a publication requirement for Article III, it would actually be — it would be contravening the FICRA's liberal interpretation because it would be the people with the worst things on their credit report that would not apply for credit. Let's assume you were on the OFAC list, the Office of Foreign Asset Control, and you were labeled as a domestic terrorist. You would not walk into a bank and try to get a loan. You would not walk into an employment office and get a job. And you would certainly not walk into a — a rental company and try to get housing for yourself because you're a terrorist. So you would have that same fear of credit denials, and you would not take the action similar to what Mr. Hogue took. And so that's — that's one of the — one of the critical problems with imposing a publication requirement. I see my time has expired, Your Honor, so unless you have other questions for me, I thank you very much for your time today. Thank you. Thank both counsel for your argument today. Case just argued, Hogue v. Silver State, is submitted.
judges: McKeown, Gould, Lasnik